# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STACY KENNEDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-01340-TWP-MPB |
| | ) | |
| REID HOSPITAL & HEALTH CARE | ) | |
| SERVICES, INC., and REID OUTPATIENT | ) | |
| SURGERY AND ENDOSCOPY LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on Motions for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendants Reid Hospital and Health Care Services, Inc. ("Reid") (Filing No. 55) and Reid Outpatient Surgery and Endoscopy, LLC ("ROSE") (Filing No. 58). After experiencing discrimination, harassment, and retaliation at the hands of coworkers and supervisors at Reid and ROSE, Plaintiff Stacy Kennedy ("Kennedy") was pressured into leaving her position as a nurse at Reid and ROSE. She initiated this lawsuit, asserting claims of discrimination, harassment, and retaliation on the basis of race and disability under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 ("ADA"). Reid and ROSE each ask for summary judgment, arguing that Kennedy did not suffer an adverse employment action, and she cannot support a *prima facie* case for her claims. For the following reasons, the Court **grants in part and denies in part** Reid's Motion and **grants** ROSE's Motion.

# I. BACKGROUND

The following facts are not necessarily objectively true, but, as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Kennedy as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## A. Discrimination and Harassment at Reid Orthopedic Surgery Center

Kennedy is an African-American female who has been diagnosed with depression, anxiety, and bipolar disorder. Her son and daughter have been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and other learning disabilities (Filing No. 86-5 at 43–44).

In October 2011, Kennedy began working as a registered nurse for Tower Specialty Surgery. Tower Specialty Surgery was acquired by Reid and began operating as Reid Orthopedic Surgery Center ("ROC") in July 2012. Kennedy was the only African-American employee at ROC (Filing No. 86-1 at 1). She worked thirty-two to forty hours per week, but did not have a set schedule. Kennedy's supervisor was charge nurse Kim Padgett ("Padgett"). After Padgett left Reid in December 2012, Misty Harrison ("Harrison") became the charge nurse and was Kennedy's direct supervisor. Kennedy's next level supervisor was Leslie Ramsey ("Ramsey") (Filing No. 86-5 at 5–6). Kennedy had positive work performance reviews, which noted that she was meeting Reid's expectations and had a good attitude (Filing No. 86-13).

When Tower Specialty Surgery was her employer, Kennedy had been permitted to leave early on Wednesdays to take her son to therapy appointments. However, after Reid acquired the business, Kennedy was given a hard time about taking a day off or leaving early on Wednesdays for her son's therapy appointments. If she could not leave work early, her son would have to miss his appointment unless Kennedy could arrange for somebody else to take him. On one occasion,

Padgett refused to let Kennedy leave early to take her daughter to the doctor when she was sick, so she had to reschedule the appointment with the doctor. Padgett would not allow Kennedy to adjust her schedule to attend to her children's needs. In contrast, Padgett freely allowed Harrison, a white nurse, to take time off or to adjust her schedule to attend to her child's needs (Filing No. 86-1 at 1).

Kennedy noted several differences in how she was treated compared to the white nurses. For example, Padgett allowed Harrison to determine her own work schedule, but scheduled Kennedy to come in early to work on Harrison's charting responsibilities. Harrison and Padgett would cover for each other so that they could take restroom and lunch breaks, but they would not cover for Kennedy when she needed to take breaks (Filing No. 86-5 at 12; Filing No. 86-1 at 1–2).

In late July 2012, within weeks of starting at Reid, Kennedy complained about this discriminatory treatment to her next level supervisor Ramsey, but Ramsey did not do anything to address these issues. (Filing No. 86-1 at 2.) Sometime between August and October 2012, Kennedy complained to Tina Johnson in Reid's human resources department about the discriminatory scheduling practice and difficulty in getting coverage so that she could take lunch and restroom breaks. Rather than investigating or addressing the problems, Johnson told Kennedy to raise the issues with Ramsey or someone else (Filing No. 86-5 at 13, 19).

Kennedy complained again to Ramsey about the discriminatory treatment in October 2012, and Ramsey held a staff meeting and explained that the scheduling needed to be fair and consistent. Padgett appeared mad and upset about the meeting. She did not do anything to change the schedule; rather, she continued to allow Harrison to pick her own schedule and required Kennedy to cover for Harrison when she needed to leave work early. After the meeting, Padgett did begin

to help with circulating responsibilities ([Filing No. 86-1 at 3](#); [Filing No. 86-5 at 13](#)). However, Harrison stopped helping Kennedy in the operating room, and she began printing quotes that were humiliating to Kennedy and taping them to a shared computer ([Filing No. 86-1 at 3](#)).

At the end of December 2012, Padgett left Reid. Harrison was promoted to be the charge nurse in ROC and became Kennedy's direct supervisor. Soon thereafter, in April 2013, Harrison transferred to the emergency room, and Ramsey asked Kennedy to be the interim charge nurse in ROC. *Id.* at 4. Kennedy was hesitant to accept the position, telling Ramsey that making her the charge nurse would give other nurses, Melodye Dodson ("Dodson") and Donna Roberts ("Roberts"), more of a reason to harass her. *Id.* Despite her concerns, Kennedy accepted the position.

In April 2013, Reid hired Dawn Ulm ("Ulm") as a circulating nurse to work in ROC three days a week, and hired Amber Welin ("Welin") (who had been working for Reid on an "as needed" basis) to work in ROC four days a week. Kennedy had previously requested that Ramsey allow her to work a four-day work week instead of a five-day week, but Ramsey had denied her requests. *Id.*

In her role as the charge nurse, Kennedy had the responsibility of setting the work schedule for the other nurses. Whenever Dodson and Roberts did not like their work schedule, they simply changed their schedule. When Kennedy complained about this problem to Ramsey, nothing was done to address the problem or require Dodson and Roberts to respect Kennedy's authority as the charge nurse. Ramsey also would not allow Kennedy to set the schedule for Ulm and Welin without asking them what days and times they wanted to work ([Filing No. 86-1 at 4](#)–5).

In April or May 2013, Kennedy directed Dodson and Roberts to stop 'spiking' (a process of preparing in advance) IV fluid bags and leaving them in the warmer overnight because this

practice could cause bacteria to grow faster and increase infection rates. Dodson and Roberts told Kennedy that she was stupid and refused to stop the practice because they had "been doing it [that] way forever." Kennedy reported the incident to Ramsey, but Ramsey did nothing. Roberts and Dodson refused to follow Kennedy's directions as the charge nurse (Filing No. 86-5 at 9).

On April 1, 2013, Kennedy went to her doctor for treatment for anxiety and depression and reported that her son has ADD and she was under a lot of pressure at work. (Filing No. 86-12 at 1). She was prescribed CELEXA. Later that month, Kennedy overheard a surgical technician, Natasha Adams, comment on Kennedy's disability. Adams said to two co-workers, "Did you see how Stacy was working today? It was like she was someone else, working all fast. I think she's bipolar." Kennedy did not report this comment to anyone (Filing No. 86-5 at 26).

In May 2013, Roberts told Harrison (who was no longer working in ROC) that Kennedy was talking about her, which was not true. That night Harrison sent a harassing text message to Kennedy. She reported the incident to Ramsey the next morning, but Ramsey never said anything to Roberts about making up a story that led to Kennedy being harassed. In late June 2013, Kennedy complained that she was not receiving charge nurse pay like the white charge nurses. Only after her complaint did Reid increase her pay to the charge nurse level, applying it retroactively to April 2013 (Filing No. 86-1 at 5; Filing No. 86-11 at 1).

On three occasions in August and September 2013, Dodson commented about people with disabilities. She stated that a boy taking medication for ADHD "just needs a good smack upside his head." *Id.* at 10. When Kennedy told Dodson that ADHD is a real condition and that her son has it, Dodson commented that, if a kid is bad, it is because the parents are bad and lazy. Dodson made more comments about a patient with ADHD a few weeks later. She went out of her way to leave the area where she was working, put on a hat and shoe covers to be able to go into the

operating room where Kennedy was located, and made derogatory comments to Kennedy about ADHD.  Kennedy again asked Dodson to stop making derogatory comments about ADHD.  Kennedy reported the incident to Ramsey.  Ramsey indicated that Dodson had already told her about it and that she would not make the comments again.  Within a month or two, Dodson again made multiple comments about patients with mental health impairments coming to ROC on the "short bus" and being "crazy" or "retarded."  When Kennedy complained to Ramsey about the continuing comments, Ramsey did nothing to address it.  *Id.*

In September 2013, Stacy Ross ("Ross"), a surgical technician, confronted Kennedy and accused her of trying to make Ross look bad in front of a doctor.  Ross got in Kennedy's face and used the "F-word."  When Kennedy complained to Ramsey about this incident, Ramsey explained that Ross was aggressive and confrontational and that she had had her own screaming match with her.  Ramsey did not address the problem for Kennedy (Filing No. 86-5 at 7; Filing No. 86-1 at 7).

A few weeks later, Ross was telling a story about a football game to some coworkers while Kennedy was in the same room.  Ross used the "N-word" three times while telling the story.  Kennedy looked up from her work when she heard the "N-word," and observed that Ross was staring at her.  (Filing No. 86-5 at 21; Filing No. 86-1 at 7.)

Kennedy felt that she had to resign from her position as the charge nurse over the operating room because the white employees were not respecting her authority and the responsibility was just too much for her.  Ramsey asked Kennedy if she was taking any medications, and Kennedy acknowledged that she was taking medication for depression and anxiety because of the harassment at work.  Ramsey responded that she understood why Kennedy would need to take medication because of working with Ross (Filing No. 86-5 at 40; Filing No. 86-1 at 6–7).  In late October 2013, Kennedy felt forced to resign from her remaining charge nurse responsibilities in

the pre-operation and post-operation areas because of the harassment from Dodson and Roberts and Reid's failure to correct it, as well as the responsibility being too much. Losing her charge nurse position caused a reduction in Kennedy's pay ([Filing No. 86-1 at 6](); [Filing No. 86-5 at 6]()–7).

Ulm was promoted to be the charge nurse over the operating room and began ordering Kennedy to help Welin, but she never made Welin help Kennedy. Ulm called and sent text messages to Kennedy while Kennedy was circulating alone, and when Kennedy did not respond, Ulm would send messages demanding that Kennedy text her back as soon as possible. Ulm also sent Kennedy text messages after 8:00 p.m. when Kennedy was at home. If Kennedy did not respond, Ulm would send messages demanding that Kennedy text her back ([Filing No. 86-9 at 6]()).

With only a five-day notice, Welin quit her job at Reid in September 2013 to return to her old job. Reid rehired Welin the following month despite her lack of giving the required two-week notice of resignation, and she was permitted to work a four-day work week ([Filing No. 86-1 at 7]()–8). Around this same time in September or October 2013, Ulm complained to Ramsey that she could not perform her charge nurse duties while still fulfilling her circulating duties. Reid hired another fulltime nurse, however she had no experience as a circulator, therefore, she was unable to relieve other nurses for breaks or lunch. *Id.* at 8.

In October and November 2013, Kennedy called the human resources department to complain about the discrimination and harassment that she had been experiencing. She left multiple messages but never received a return telephone call ([Filing No. 86-5 at 22](); [Filing No. 86-1 at 8]()). Because of the discrimination and harassment that she was experiencing at ROC, on October 22, 2013, Kennedy applied for a transfer to ROSE ([Filing No. 86-1 at 8](); [Filing No. 86-15 at 4]()–6). On November 7, 2013, Ulm gave ROSE a positive reference for Kennedy, stating that she was dependable, punctual, and efficient ([Filing No. 86-15 at 3]()). On November 8, 2013,

Kennedy accepted an offer for a job transfer to ROSE and gave ROC her two-week notice (Filing No. 86-5 at 30; Filing No. 86-1 at 8). Kennedy told Ulm that she was transferring because of the hostile work environment and harassment in ROC, which was never corrected (Filing No. 86-1 at 8).

After submitting her two-week notice to ROC but before transferring to ROSE, Kennedy experienced another incident of harassment with Ross. On November 11, 2013, Kennedy went to the operating room to inform Ross that a doctor wanted a knee brace added to the preference card. Ross was irate and directed the "F-word" at Kennedy. After Ross settled down, Kennedy went back to Ross and asked what was wrong. Ross screamed and cursed and threw sharp objects on the table in front of Kennedy. Charge nurse Ulm was in the room while this occurred, but she did nothing to stop the harassment (Filing No. 86-5 at 16).

The following morning, Kennedy talked with Dr. Karl Baird, the medical director, and told him that she was nervous to go back to work because of the harassment from Ross. She asked whether she could transfer to ROSE a week early. Dr. Baird denied Kennedy's request and said that she needed to complete her full two-week notice or there might be issues between Kennedy and the doctors at ROSE that could make her working conditions unbearable. *Id.*

In mid-November 2013, Ulm and Roberts called Kennedy and fellow nurse, Maribeth Evans, into the office and questioned them about a letter that someone had written concerning poor care that Dodson had given to a patient. Ulm and Roberts threatened Kennedy and Evans that if they found out who wrote the letter, that person would be fired because it was a HIPAA violation. *Id.* at 24–25. Evans asked others in the department if they also were asked about the letter, and they said they had not been asked about it (Filing No. 86-4 at 3).

Ulm asked Kennedy to relieve Welin after Kennedy finished a meeting on November 14, 2013. Ulm was not at work on November 14, 2013 so when Kennedy got out of the meeting, she contacted Roberts, the charge nurse on duty, who said that Welin was almost finished and that she did not think it was necessary to relieve her, so Kennedy could go home. The next day, Ulm called Kennedy and yelled at her for not relieving Welin. (Filing No. 86-5 at 17.) Ulm called Kennedy again on November 15, 2013 and told her that Dr. Baird wanted her to be certain that Kennedy finished her two-week period in ROC "or else." *Id.* Kennedy told Ulm that she would complete the two-week period but that she could not work with Ross. Ulm continued to schedule Kennedy to work with Ross until she was transferred to ROSE (Filing No. 86-1 at 10).

Kennedy felt that she could not take any more harassment, so she called Laura Stewart ("Stewart") in the human resources department on November 15, 2013 to set up an appointment to talk with her. *Id.*; Filing No. 86-5 at 17. Kennedy also called Tonya Miller ("Miller") at ROSE to explain what Dr. Baird and Ulm told her and to express her concern about working at ROSE if she would continue to be harassed (Filing No. 86-1 at 10).

On November 18, 2013, Kennedy met with Stewart in the human resources department and complained about being harassed based on her race and disability and the disability of her son, specifically mentioning Ross, Dodson, Roberts, and Ulm. She also complained that Ramsey failed to do anything to address the harassment and discrimination. From August 2012 through October 2013, Kennedy had reported to Ramsey many times that she was being treated differently because of her race and disability. Stewart told Kennedy that she would conduct an investigation (Filing No. 86-5 at 15–19).

Stewart met with Ulm on November 19, 2013 and told her that she needed to hold others accountable for their actions and require them to follow Reid's standards. After Kennedy

transferred from ROC to ROSE, Ulm gave a written notice of corrective action to Ross on November 25 or 26, 2013 ([Filing No. 86-31](#); [Filing No. 86-19](#)).

November 22, 2013 was Kennedy's last scheduled day to work in ROC, but she took that day off work to address problems that her son was having at school. ([Filing No. 86-17](#); [Filing No. 86-1 at 10](#).)

## B.     Discrimination and Harassment at Reid Outpatient Surgery and Endoscopy

On November 25, 2013, Kennedy began working as a registered nurse at ROSE, which is located on the second floor of the Reid Hospital building ([Filing No. 86-1 at 10](#)).  On November 27, 2013, about a week after being counseled by Stewart, Ulm contradicted the good reference that she had given to ROSE about Kennedy on November 7, 2013 – that she was dependable, punctual, and efficient.  Instead, Ulm stated on the employment action sheet for Kennedy's resignation that she would not rehire Kennedy because of Kennedy's work performance and attitude toward the facility ([Filing No. 86-15 at 3](#); [Filing No. 86-18 at 1](#)).  Even though Evans, a white nurse, had problems in her work history, she was given a conditional rehire status unlike Kennedy ([Filing No. 86-18 at 2](#)).

Kennedy applied to work at ROSE via Reid's "employee request for transfer" procedure ([Filing No. 86-15 at 4](#)–6).  She kept the same name-badge, clock-in-badge, and email address ([Filing No. 86-5 at 32](#)).  Kennedy was the only African-American nurse at ROSE.

Emily Ross was assigned as Kennedy's trainer.  Kennedy asked to be trained as if she was a brand new circulating nurse.  Kennedy felt like Emily Ross was not providing adequate training for her new responsibilities.  For example, Emily Ross left Kennedy alone for twenty to thirty minutes in the operating room during an operation.  Kennedy did not know what she was supposed to do during the operation.  After this incident, Kennedy complained to Lynn Greene, one of the

supervisors, that she was not being properly trained, and ROSE stopped pairing Kennedy with Emily Ross (Filing No. 86-5 at 32–35).

When Kennedy was paired with Danielle Kirkland ("Kirkland") for a spine surgery on December 30, 2013, Kirkland left Kennedy alone, and Kennedy mistakenly brought the patient back to the operating room without the patient first having been marked for surgery. The doctor complained to the staff in the room about leaving a new nurse alone and not training them, which was why so many mistakes were being made. *Id.* at 33. After this incident, Kennedy was in the locker room next to the breakroom and overheard her supervisor, Miller, telling Kennedy's coworkers about the incident and calling Kennedy stupid. *Id.* at 34.

On January 22, 2014, during a surgery, a surgical technician told Kennedy to throw away two raytek and a suction piece, so Kennedy put the supplies in the trash. However, the supplies needed to be accounted for during the "final count" before actually being thrown away, but Kennedy had not been informed that the items needed to be saved for the final count. Following this incident, ROSE clinical educator Teresa Barley ("Barley") explained the proper procedure to Kennedy. *Id.* at 33–34; Filing No. 86-22. Barley had been meeting with Kennedy on a weekly basis to provide training. After Barley provided guidance following the final count incident, Kennedy did not commit any other safety or final count mistakes. Once she received proper training, Kennedy became more confident and independent (Filing No. 86-22).

Kennedy's initial evaluation at ROSE took place on February 25, 2014. Barley noted, "We are glad that you joined our team, Stacy! Keep up the good work!" And Kennedy commented, "Everyone has been really helpful." (Filing No. 60-5 at 8; Filing No. 86-5 at 34.) At the beginning of March 2014, ROSE put Kennedy on the on-call schedule because she was "doing so well" and was proficient in her job training and performance (Filing No. 86-5 at 34).

On an occasion in March 2014, ROSE supervisors directed Kennedy to work in the operating room with ROC employees to cover for Welin on a ROC case when Welin left early to attend a parent-teacher conference. Kennedy was required to work with Stacy Ross even though she had been a main source of harassment while Kennedy was at ROC (Filing No. 86-5 at 21; Filing No. 86-1 at 16).

On another occasion in March 2014, Kennedy and Kirkland were preparing for a carpel tunnel surgery. Dr. Richard Miller came into the room and yelled at Kennedy for not telling Kirkland that she was doing things incorrectly. When Dr. Miller walked out of the room, he said "stupid bitches" under his breath (Filing No. 86-5 at 36–37; Filing No. 86-1 at 16).

While eating lunch in the breakroom on March 17, 2014, Kennedy had to leave to address a need in the operating room. Kennedy's supervisor Miller and coworker Kirkland were in the breakroom as well as Dr. Sukhminder Bhangoo. Dr. Bhangoo was known for eating other people's food. Dr. Bhangoo also started IVs on patients with Hepatitis C and other communicable diseases without wearing gloves. When Kennedy had to leave the breakroom in the middle of eating lunch, she was going to throw her food away so that Dr. Bhangoo would not eat it. However, Miller and Kirkland told Kennedy that they would protect her food. When Kennedy returned to the breakroom and took a bite of her food, Kirkland laughed and asked if it was good. Kennedy asked three times what happened to her food and then Miller told her that Dr. Bhangoo ate some of it (Filing No. 86-5 at 28–29, 36; Filing No. 86-1 at 16; Filing No. 86-27 at 13).[1]

Mellissa Stephens, ROSE's clinical coordinator, told Kennedy the next day that Dr. Bhangoo's conduct was gross and that she would not have eaten after him either. Kennedy was humiliated and upset when her coworkers talked and laughed about what happened. Kennedy felt

---

[1] During her deposition, Kennedy acknowledged that the "only problems [she] had at ROSE was Dr. Bhangoo eating [her] lunch. [She] didn't have any problem with [her] coworkers." (Filing No. 86-5 at 36, 29.)

that she could not continue working in a hostile environment and called Lorraine Smith, ROSE's administrative secretary and benefits manager. Kennedy told Smith about the lunch time incident and that she could not work in an environment that put her health at risk. Smith told Kennedy to speak with her supervisor, Miller, before she did anything. The following day, Miller spoke with Kennedy and told her that ROSE could not do anything about the lunch incident, so they would accept a two-week notice of resignation. Kennedy had not previously offered a resignation (Filing No. 86-1 at 16–17).

On March 19, 2014, Kennedy submitted a one-line resignation, stating her last day of work would be April 2, 2014. Kennedy felt forced to resign because she could no longer work where she was harassed, her health was at risk, and the employer gave her no choice. *Id.* at 17. Kennedy's last scheduled day to work was April 2, 2014, but she was already scheduled for a week off for vacation the next week, so her actual last day at work was March 19, 2014. *Id.*; Filing No. 86-5 at 36. Miller completed a Reid "Employment Action Sheet" for Kennedy's resignation, noting that Kennedy was conditionally eligible for rehire (Filing No. 86-25 at 1–2).

In April or May 2014, Kennedy learned that Ulm was claiming she had fired Kennedy from ROC. Kennedy began calling the human resources department at Reid every week to obtain a copy of her personnel file. She wanted to work again at Reid in a new department and wanted to know if she was eligible to be hired again. She was repeatedly referred to Brent Sanders' voicemail, but he never returned her telephone calls and messages (Filing No. 86-5 at 36).

On May 22, 2014, Kennedy applied for a position at the Reid Urgent Care Center. After applying, Kennedy called Reid human resources again to see if she was eligible for rehire and to check on her application. Kennedy told the receptionist that she did not want to leave another message for Sanders because he did not return her telephone calls. She left a message for Lisa

Nantz ("Nantz") in human resources, but Nantz also did not return Kennedy's call ([Filing No. 86-1 at 18](#)).

On May 29, 2014, Kennedy called again and told human resources director Carrie Kolentus that she had been trying for weeks to get information on her rehire status, but no one was returning her messages and telephone calls. Kolentus told Kennedy that she would ask Nantz to check on Kennedy's file and call her back. Nantz called Kennedy later that day and said she did not see anything in Kennedy's file about her rehire status, so she would have to call Kennedy's former supervisor at ROC (Ulm) to learn more. *Id.* at 18–19.

After Nantz talked with Ulm, she called Kennedy and told her that Ulm said she was ineligible for rehire because of her attitude toward the company and her work performance. Kennedy told Nantz that this was not true because she had a good performance review in October 2013, the month before she transferred to ROSE. *Id.* at 19.

Kennedy then sent an email to Nantz requesting copies of her performance evaluations and the complaint she filed with the human resources department in November 2013 regarding harassment and a hostile work environment ([Filing No. 86-27 at 1](#)). On the same day, May 29, 2014, Kennedy contacted the Indiana Civil Rights Commission ("ICRC") to complain about the discrimination and harassment that she had experienced ([Filing No. 86-5 at 38](#)).

A potential employer, Advantage Home Care, faxed a reference request to ROSE for Kennedy, and on May 30, 2014, Smith completed the form, stating Kennedy was only a fair performer, was not a good fit in surgery, and ROSE would not rehire Kennedy as a circulating nurse ([Filing No. 86-28 at 2](#)).

On June 24, 2014, Kennedy filed her *pro se* Complaint of Discrimination with the ICRC, which was dual-filed with the U.S. Equal Employment Opportunity Commission ("EEOC").

Kennedy asserted a claim of employment discrimination based on her race against "Reid Hospital," with the date of last discrimination occurring on March 19, 2014, her last day of work at ROSE (Filing No. 86-29 at 1–5).

On January 5, 2015, Kennedy filed her Amended Charge of Discrimination with the EEOC, using the same charge number as the June 2014 filing.  In her Amended Charge, Kennedy added claims for disability discrimination and retaliation, still naming "Reid Hospital" as the offending employer.  She also attached nearly three pages to the Amended Charge, providing a description of the events that had occurred at ROC and ROSE.  *Id.* at 6–9.

On April 14, 2015, Kennedy filed her second Amended Charge of Discrimination with the EEOC, again using the same charge number as the June 2014 filing.  In this Amended Charge, Kennedy specifically named ROSE as another employer on the first page, and she attached the same three-page description of the events that had occurred at ROC and ROSE.  *Id.* at 10–13.

Kennedy filed this lawsuit on August 25, 2015 (Filing No. 1), and then amended her Complaint on November 16, 2015, asserting claims against Reid and ROSE for race and disability discrimination and retaliation under Title VII, Section 1981, and the ADA (Filing No. 13).  After answering the Amended Complaint, Reid and ROSE filed separate Motions for Summary Judgment.

## II.     SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the

record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The Court views the designated evidence in the light most favorable to Kennedy, as the non-moving party, and draws all reasonable inferences in her favor. *Bright v. CCA*, 2013 U.S. Dist. LEXIS 162264, at *8 (S.D. Ind. Nov. 14, 2013). "However, employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id.* at *8–9 (citation and quotation marks omitted).

## III.    DISCUSSION

Reid and ROSE assert that summary judgment is appropriate on Kennedy's race and disability discrimination and retaliation claims, because Kennedy did not suffer any adverse employment action, and no harassment or constructive discharge occurred. Reid and ROSE also assert various procedural issues that they assert entitle them to summary judgment.

### A.    Reid and ROSE's Procedural Arguments for Summary Judgment

Reid asserts that Kennedy's ADA claims and some of her Title VII claims are barred because she failed to timely file a charge of discrimination asserting these claims. A plaintiff must file a charge with the EEOC within 180 days of the complained of employment action in states that have no equal employment opportunity agency, but in deferral states like Indiana, "[i]f a complainant initially institutes proceedings with a state or local agency with authority to grant or seek relief from the practice charged, the time limit for filing with the EEOC is extended to 300 days." *EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 110 (1988); 42 U.S.C. § 2000e-5(e). These same standards apply to ADA claims. *See* 42 U.S.C. § 12117(a).

Reid explains that on June 24, 2014 (216 days after her last day at Reid), Kennedy filed her Complaint of Discrimination with the ICRC claiming that Reid discriminated against her on the basis of her race. Reid argues that this state agency complaint did not refer to or allege any discrimination on the basis of disability. Then on January 5, 2015 (412 days after her last day at Reid), Kennedy filed her Amended Charge of Discrimination and for the first time alleged that she had been discriminated against on the basis of disability in addition to race. On April 14, 2015, Kennedy filed her second Amended Charge of Discrimination with the EEOC and added ROSE as a separate employer.

Reid argues that Kennedy's ADA claims are barred because they were not asserted in the original Complaint of Discrimination, and they do not reasonably relate to or arise out of the race discrimination and harassment claim that was asserted, citing to *Whitaker v. Milwaukee Cty., Wisconsin*, 772 F.3d 802, 812–13 (7th Cir. 2014), and *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003). Because the disability claims were not raised until January 5, 2015 (412 days after her last day at Reid), Reid argues they are time-barred, and summary judgment should be granted on the ADA claims.

Reid further argues that any discrete act of discrimination that occurred before August 28, 2013, is time-barred, because that date is 300 days before the Complaint of Discrimination was filed with the ICRC on June 24, 2014. Reid specifically points to conduct that occurred between July 2012 and August 2013: Padgett giving Harrison a preferential schedule, the nursing staff not following Kennedy's request not to 'spike' the IV bags, and Adams' comment that she thought Kennedy was bipolar. Reid argues that these incidents are time-barred to the extent they are raised as discrete acts of discrimination rather than part of a hostile work environment or constructive discharge.

ROSE argues that Kennedy's Title VII and ADA claims are time-barred because Kennedy failed to timely file a charge of discrimination against them. ROSE asserts that Kennedy waited 377 days after she left ROSE—April 2, 2014 to April 14, 2015—to file a charge of discrimination naming ROSE as a respondent, and thus, Kennedy did not file her charge against ROSE within the statutorily prescribed time period, and her Title VII and ADA claims are barred as to ROSE.

In response, Kennedy asserts that ROSE is a department within Reid, so the appropriate date to consider regarding both Reid and ROSE is April 2, 2014, Kennedy's last day of work as a Reid employee at ROSE. Kennedy filed her initial Complaint of Discrimination on June 24, 2014,

less than three months after her last day of work. She explains that she filed her Amended Charge of Discrimination on January 5, 2015, within 300 days of her last day of work. Her January 2015 Amended Charge specifically noted disability as a form of discrimination. Kennedy argues that her disability claims arise out of the same conduct and reasonably relate to the race discrimination claim that was asserted in the original June 2014 Complaint of Discrimination, so the disability claims should relate back to June 2014. She also argues that the June 2014 Complaint specifically noted March 19, 2014 as the date the discrimination last occurred, which would provide notice that ROSE was included in the Complaint. Hence, Kennedy asserts, her claims were timely filed against both Reid and ROSE for race and disability discrimination and harassment.

Reid and ROSE reply that they are separate entities, so the first two Charges against "Reid Hospital" cannot support claims against ROSE, and the disability claims were not contained in the first Complaint and do not relate to or arise out of the same conduct complained of in the original Complaint, so they cannot relate back to the original Complaint. Reid points to *Fairchild v. Forma Sci.*, 147 F.3d 567, 575 (7th Cir. 1998), which held, "an untimely amendment that alleges an entirely new theory of recovery does not relate back to a timely filed original charge." In *Fairchild*, the Seventh Circuit denied relation back to a plaintiff who asserted that his ADA claim should be considered timely because the facts arose out of the same conduct that supported his timely-filed age discrimination claim.

The designated evidence reveals that the original Complaint filed with the ICRC (and dual-filed with the EEOC) asserted a claim of discrimination based on race against "Reid Hospital," with the date of last discrimination occurring on March 19, 2014, which was Kennedy's last day of actual work at ROSE. The January 2015 Amended Charge included this same date and provided a narrative description of the harassment that Kennedy experienced at both Reid and ROSE. This

is enough to put both Reid and ROSE on notice that they were facing a Charge of Discrimination. Therefore, the race-based claims asserted against Reid and ROSE are not time-barred, and summary judgment **is not warranted** on this basis.

The disability claim arising under the ADA was not asserted in the original Complaint of Discrimination filed with the ICRC. Kennedy first asserted her disability claim in her January 2015 Amended Charge. The disability claim is distinct from the race-based claim; while the incidents occurred at the same place of employment with the some of the same individuals, Kennedy's experiences of discrimination based on race and based on disability were different. Additionally, a theory of recovery under the ADA for disability discrimination is distinct from recovery under Title VII for racial discrimination. Thus, the Court determines that the disability claim first asserted in the January 2015 Amended Charge does not relate back to the June 24, 2014 Complaint of Discrimination.

Because the disability claim does not relate back, the Court must consider when Kennedy experienced discrimination or harassment based on disability to determine whether the disability claim was timely asserted in the January 2015 Amended Charge. In April 2013, Kennedy overheard a comment about her bipolar disability. In August and September 2013, on three occasions, Kennedy was subjected to comments about children with ADHD and that their parents being bad and lazy. The latest incident of any disability discrimination or harassment occurred in October or November 2013, when derogatory comments were made in Kennedy's presence about people with mental health disabilities and the "short bus". While not an incident of disability discrimination or harassment, on November 18, 2013, Kennedy met with Stewart in the human resources department to complain about the harassment she had experienced based on her race and disability and the disability of her son. All of this occurred more than 300 days before Kennedy

filed her Amended Charge on January 5, 2015 ([Filing No. 86-29 at 6](#)). Thus, Kennedy's disability claim was not timely filed and cannot be asserted in this action; therefore summary judgment in favor of Reid and ROSE is **granted** on Kennedy's disability claim.

**B.      Legal Principles Governing Employment Discrimination, Harassment, and Retaliation Claims**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Title VII also makes it unlawful for an employer "to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).

Section 1981 provides,

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . .

42 U.S.C. § 1981.  "The substantive standards and methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under § 1981."  *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012).  "[A]lthough section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical."  *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009) (citation omitted); *see also Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403 (7th Cir. 2007) ("we generally have applied the same prima facie requirements to discrimination claims brought under Title VII and

section 1981"); *Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 681–82 (7th Cir. 2001) ("we analyze § 1981 and Title VII discrimination claims in the same manner").

A plaintiff may show unlawful discrimination under Title VII through a direct method or, as an alternative, indirectly through the burden-shifting mechanism established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000). Under the direct method, a plaintiff may offer direct or circumstantial evidence to prove discrimination. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Alternatively, under the indirect method of proof, the plaintiff has the initial burden of establishing a *prima facie* case that the adverse employment action was impermissibly discriminatory. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006). If the plaintiff satisfies this burden, then the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. The burden then shifts back to the plaintiff to submit evidence that the employer's stated reason is pretextual. *Id.*

The plaintiff establishes a *prima facie* case of discrimination by presenting evidence that would allow a reasonable jury to find that: (1) she is a member of a protected class; (2) she performed satisfactorily on the job in accordance with her employer's legitimate expectations; (3) despite her reasonable performance, she was subjected to an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably. *Id.*

To establish a *prima facie* case of retaliation, the plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) she satisfactorily met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly situated employee who did not engage in the statutorily protected activity. *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 309 (7th Cir. 2012).

A claim for a hostile work environment or harassment on the basis of race is shown through evidence establishing:  (1) the work environment was both subjectively and objectively offensive; (2) race was the cause of the harassment; (3) the conduct was severe or pervasive; and (4) there was a basis for employer liability.  *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010).  A plaintiff "must show a basis for employer liability by proving either (1) that a supervisor participated in the harassment that created the hostile work environment or (2) that [the employer] was negligent in discovering or remedying harassment by [the] coworkers."  *Id.*

Regardless of whether a plaintiff uses the direct method, indirect method, or both methods, "the legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."  *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence.  Evidence is evidence."  *Id.*  "Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'"  *Id.*  The sole question that matters is whether a reasonable juror could conclude that the plaintiff would have kept her job if she was a different race or did not engage in protected activity and everything else had remained the same.  *See Achor v. Riverside Golf Club*, 117 F.3d 339, 341 (7th Cir. 1997); *Troupe v. May Dep't Stores Co.*, 20 F. 3d 734, 736–37 (7th Cir. 1994).

Describing the evidence courts consider when reviewing discrimination claims, the Seventh Circuit explained:

> Three types of circumstantial evidence of intentional discrimination can be distinguished. The first consists of suspicious timing, ambiguous statements oral or

written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. This is the most common type of evidence in an intentional discrimination case, now that employers have taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written. Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment. And third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination. Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together.

*Troupe*, 20 F.3d at 736 (citations omitted).

The Seventh Circuit further explained:

[I]t is not true that to get over the hurdle of summary judgment a plaintiff must produce the equivalent of an admission of guilt by the defendant. All that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had fired the plaintiff because the latter was a member of a protected class.

*Id.* at 737.

## C.  Kennedy's Harassment, Discrimination, and Retaliation Claims

There is no dispute that Kennedy is a member of a protected class and that she performed satisfactorily on the job in accordance with Reid and ROSE's legitimate expectations. The Defendants, however, assert that Kennedy was not subjected to a hostile work environment, did not suffer an adverse employment action, was not treated less favorably than similarly situated employees, and was not retaliated against after engaging in any statutorily protected activity. The Court will address the harassment, discrimination, and retaliation claims in turn.

### 1.  Harassment

Reid asserts that Kennedy's harassment claim fails because the conduct alleged does not rise to the level of severity or pervasiveness to constitute harassment. It argues that a court should not "find a hostile work environment for mere offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). Reid argues that the conduct Kennedy complains about is not sufficient to support her harassment claim: dissatisfaction with her work schedule and opportunities to take breaks, employees not respecting her authority as the charge nurse, employees not liking her, employees using the "N-word" in her presence and cursing at her, and her supervisor sending her text messages and calling her after work hours.

Reid contends that Kennedy has not made any connection between the alleged harassment and her race. It points to Kennedy's deposition testimony, where she stated, "I believe I didn't give anybody any reason not to like me at work. And I'm working with all white employees, but I'm being treated differently and I'm the only black employee." ([Filing No. 86-5 at 14](#).) Reid argues that such speculation cannot support a harassment claim. It further argues that there is no basis for employer liability because the harassers were Kennedy's coworkers, not supervisors, and Reid was not negligent in responding to any complaints about the harassment. Reid contends that Kennedy did not complain until after she transferred to ROSE. When Kennedy complained about Ross' use of the "N-word," Reid asserts, it disciplined Ross for that conduct.

In opposition to the harassment claim, Reid further contends that Title VII is not a "civility code," and liability does not arise out of "sporadic use of abusive language." *Ford v. Minteq Shapes & Servs., Inc.*, 587 F.3d 845, 848 (7th Cir. 2009). Reid suggests that the isolated incidents and comments by different people about different topics were spread out over a sixteen month

period and did not create an objectively hostile environment; the incidents and comments were not so severe or pervasive to alter Kennedy's work conditions.

ROSE advances similar arguments concerning Kennedy's harassment claim against it. ROSE argues that none of the conduct rose to the level of severity or pervasiveness to support a harassment claim. During her deposition, Kennedy acknowledged that the "only problems [she] had at ROSE was Dr. Bhangoo eating [her] lunch. [She] didn't have any problem with [her] coworkers." (Filing No. 86-5 at 36, 29.) And further, on Kennedy's initial evaluation dated February 25, 2014, Kennedy commented, "Everyone has been really helpful." (Filing No. 60-5 at 8; Filing No. 86-5 at 34.) ROSE argues that Miller and Dr. Miller's two comments that Kennedy was "stupid" cannot support a racial harassment claim as they were not directed toward her race, and they were isolated, non-severe comments.

ROSE asserts that Kennedy's alleged lack of training cannot support a harassment claim because additional training was provided when requested, as admitted by Kennedy in her deposition (Filing No. 86-5 at 34; Filing No. 86-22). Lastly, ROSE contends that the incident when Dr. Bhangoo ate Kennedy's food cannot support a racial harassment claim because Kennedy acknowledged that she knew Dr. Bhangoo ate food from everyone regardless of who they were (Filing No. 86-5 at 36). ROSE argues that the food eating incident and the two comments about Kennedy being "stupid" do not amount to racially severe and pervasive conduct to support a racial harassment claim.

Kennedy asserts that she has presented sufficient evidence to show she suffered harassment based on her race that was severe and pervasive enough to impact her work performance and affect her work responsibilities. The harassment caused her to take a demotion from the position of

charge nurse, lose her job title, lose supervisory authority, and lose two dollars per hour in pay and caused her to seek a job transfer to ROSE from Reid.

Kennedy explains that Reid refused to provide her with a desirable work schedule, while allowing the white nurses to have a three or four day work week with more desirable hours. Reid refused to require the white employees to cover for Kennedy so that she could take restroom and lunch breaks. The white employees made up lies to get Kennedy into trouble, and Reid did nothing to address it. Racially derogatory comments were made in Kennedy's presence to elicit a response from her, and the white nurses helped each other but refused to help Kennedy, which interfered with her work and humiliated her.

Kennedy asserts that there is a basis for liability on the part of Reid because she was harassed by Padgett, Roberts, and Ulm when they were her supervisory charge nurses, and when she was harassed by coworkers, she complained to Ramsey at the direction of the human resources department, but Ramsey did not do anything to address the harassment. When Reid finally corrected Ross for her racially derogatory comments, Kennedy had already transferred to ROSE, so it had no effect to curtail the harassment against Kennedy.

With respect to ROSE, Kennedy explains that ROSE is ignoring all the evidence of harassment that occurred in the ROC department at Reid, and "Reid was the employer of the employees in both of its departments, ROC and ROSE. She argues that even if Reid had not employed the harassing employees, it would not matter because the line between the entities was blurred." ([Filing No. 88 at 17](#).) In her deposition testimony, Kennedy stated she had to request training in order to receive it, and only after her request were people helpful. Prior to receiving the requested training, Kennedy was "written up" for her shortcomings in her work performance. She was forced to work with ROC staff whom ROSE knew had harassed Kennedy. A doctor

yelled at Kennedy for not telling Kirkland that she was doing things incorrectly instead of yelling at Kirkland. Kennedy also points to her humiliating experience of Dr. Bhangoo eating her food and the white employees laughing at her. When she complained about the food incident, she was pressured into submitting her resignation. Kennedy asserts that the denial of proper training interfered with her work performance, which led to her being written up for her mistakes. She contends that the humiliating experience of Dr. Bhangoo eating her food interfered with her ability to work because it led to her forced resignation.

The Court considers all the facts and circumstances giving rise to Kennedy's harassment claim rather than looking at particular facts in isolation. The parties have designated evidence that creates a dispute regarding the material facts concerning a hostile work environment. While Reid downplays the incidents that occurred with its employees and supervisors, Kennedy's designated evidence suggests that, as a whole, Kennedy's work environment was hostile. She designated evidence regarding offensive conduct and statements that were racial in nature and that she had complained to supervisors about racial discrimination and harassment, yet action to address the problems was not taken or was delayed.

Evidence has been designated that suggests Reid did not properly address the harassment and that some of the harassment came from people in supervisory roles, such as Padgett, Roberts, and Ulm. The evidence raises a dispute regarding the harassment's interference with Kennedy's work performance: she requested a demotion from the position of charge nurse, lost her job title, lost supervisory authority, lost two dollars per hour in pay, and requested a job transfer to ROSE from Reid. The stress from the work environment caused her work to be too much for her. Kennedy has designated evidence supporting her claim that she was humiliated by the harassing conduct. The designated evidence suggests that there is a dispute regarding the objective severity

and pervasiveness of the racially-offensive conduct that occurred over a number of months while Kennedy was employed at Reid. Because of these disputes found in the designated evidence, the Court cannot enter summary judgment at this stage of the proceedings on Kennedy's racial harassment claim against Reid and must allow the claim to be presented to the fact finder. Thus, the Court **denies** Reid's Motion for Summary Judgment on Kennedy's racial harassment claim.

However, Kennedy's argument concerning ROSE is unavailing. If ROSE and Reid are one-and-the-same as Kennedy asserts, then Kennedy can pursue her harassment claim against Reid for any conduct that occurred in the ROC and ROSE departments, and she will not be left without recourse. On the other hand, if considering Reid and ROSE as separate entities, then the conduct that occurred at Reid in the ROC department cannot be the basis for claims against ROSE.

Kennedy's complaints against ROSE center on an alleged lack of training, being written up for mistakes because of a lack of training, comments that she was stupid, and Dr. Bhangoo eating her food and other employees laughing at her. There is nothing in the designated evidence that suggests the training issues were based on race. The simple fact that Kennedy is African-American is not enough to make the alleged lack of training an issue of race. Nothing suggests that race was a factor in Kennedy's training. ROSE did provide training when it was requested, and the write-ups were the result of work mistakes that Kennedy made, which were then appropriately and promptly addressed with additional training. ROSE put Kennedy on its on-call schedule because of her proficiency with training and performance.

The two comments that Kennedy was stupid were not related to race and were not in a racial context. The designated evidence indicates that it was well known that Dr. Bhangoo ate everyone's food; it had nothing to do with race or with Kennedy specifically. Employees laughing about Dr. Bhangoo eating Kennedy's food similarly was not about race but rather was about a

juvenile prank.  A review of the designated evidence and consideration of the circumstances in their entirety leads the Court to conclude that a claim for racial harassment against ROSE is not supported by evidence and cannot proceed beyond the summary judgment stage.  Therefore, the Court **grants** ROSE's Motion for Summary Judgment on Kennedy's racial harassment claim.

 2.      <u>**Discrimination**</u>

To support a claim of discrimination, a plaintiff must show that she is a member of a protected class, met her employer's legitimate expectations, was subjected to an adverse employment action, and similarly situated employees outside of her protected class were treated more favorably.  *Rhodes*, 359 F.3d at 504.  The ultimate question is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."  *Ortiz*, 834 F.3d at 765.

It is undisputed that Kennedy is a member of a protected class and that she met her employer's legitimate expectations.  However, Reid and ROSE contend that Kennedy did not suffer an adverse employment action, and she was not treated less favorably than similarly situated employees.

Pointing to *Nagle v. Village of Calumet Park*, 554 F.3d 1110, 1119 (7th Cir. 2009), Reid argues that Kennedy did not suffer an adverse employment action because she did not lose compensation or benefits, she was not terminated, her career prospects were not stunted, and her work conditions were not changed to make her job humiliating, unsafe, or degrading.  Reid contends that Padgett creating an unfair work schedule and denying lunch and restroom breaks do not amount to adverse employment actions.  It argues that derogatory and offensive comments

from coworkers do not amount to adverse employment actions. Reid asserts that none of its actions "resulted in any negative or tangible job consequences for Kennedy." ([Filing No. 56 at 26](#).)

Reid further argues that Kennedy's voluntary resignation and request to transfer to ROSE do not amount to a constructive discharge and cannot be considered an adverse employment action. A voluntary resignation may be treated as an adverse employment action only if "the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004). The intolerable work environment must be because of the discrimination. Reid asserts that Kennedy's claim is foreclosed because she cannot show she was subjected to a hostile work environment.

Reid contends that Kennedy's work environment was not intolerable because she did not complain about any harassment until after she provided notice that she was leaving to work at ROSE, and she did not allow Reid an opportunity to cure any issues. Reid asserts that most of the conduct reported by Kennedy occurred just before she transferred to ROSE, thus undermining any argument that the working conditions were intolerable.

Finally, Reid argues that "Kennedy's bald assertion that white nurses were given more favorable schedules, falls far short of establishing that a similarly situated employee, outside of Kennedy's protected class(es), was treated more favorably than Kennedy." ([Filing No. 56 at 29](#).) The nurses at Reid had different hour and schedule constraints than what Kennedy agreed to accept when she was hired by Reid.

ROSE advances the same arguments as Reid: Kennedy did not suffer an adverse employment action, and there are no similarly situated employees outside of Kennedy's protected class who received more favorable treatment. As soon as Kennedy complained that she was not receiving adequate training for her new position, ROSE provided additional training. When

Kennedy complained that Emily Ross was not an adequate trainer, ROSE assigned other individuals to train Kennedy. Kennedy was provided all the training she requested and was put on the on-call list because she was proficient in her training and performance. On her initial evaluation in February 2014, Kennedy commented, "Everyone has been really helpful." (Filing No. 60-5 at 8; Filing No. 86-5 at 34.) ROSE additionally contends that the comments that Kennedy was stupid and the incident of Dr. Bhangoo eating her food were isolated incidents that did not alter her working conditions. Thus, ROSE asserts, Kennedy did not suffer an adverse employment action by being denied training.

Like Reid, ROSE argues that Kennedy's voluntary resignation does not amount to a constructive discharge and cannot be considered an adverse employment action. Nothing suggests the work environment at ROSE was intolerable, and further, she was not subjected to a hostile work environment at ROSE. Thus, ROSE asserts, Kennedy's claim is foreclosed because she cannot show she was constructively discharged, subjected to a hostile work environment, or suffered an adverse employment action.

ROSE asserts that Kennedy has failed to show that similarly situated employees outside her protected class were treated more favorably. It argues that "Kennedy's bald assertion that white nurses did not have to ask for the training they desired, falls far short of establishing that a similarly situated employee, outside of Kennedy's protected class(es), was treated more favorably than Kennedy." (Filing No. 59 at 18.) ROSE further asserts that "Kennedy has not identified a single ROSE employee 'directly comparable' to Kennedy, outside of Kennedy's protected class(es), who ROSE treated more favorably than Kennedy." *Id.*

Kennedy contends she has designated evidence that shows she suffered adverse employment actions: she was compelled to request a demotion from the position of charge nurse,

she lost her job title, she lost supervisory authority, and she lost two dollars per hour in pay. She argues she was subjected to a humiliating work environment with no relief from Reid. She was compelled to quit her position at Reid and request a job transfer to ROSE. In being compelled to transfer to ROSE, she lost her experience and seniority at ROC and had to start with basic training and fewer opportunities at ROSE. Kennedy also asserts she suffered an adverse employment action in being listed as ineligible for rehire at Reid.

Regarding similarly situated employees outside her protected class receiving better treatment, Kennedy points to designated evidence showing that white nurses Harrison and Padgett provided coverage for restroom and lunch breaks for each other but refused to provide coverage for these breaks for Kennedy, the only African-American. Padgett would not give Kennedy time off work to address personal needs but would allow Harrison and the other white nurses to take time off for personal needs. Kennedy was asked to come in early or stay late to cover for Harrison, but no one was asked to cover for Kennedy when she needed to leave early. Kennedy charted for Harrison, but nobody helped Kennedy chart. White nurses Ulm and Welin regularly helped each other circulate, but they would not help Kennedy. As charge nurse, Ulm made Kennedy help Welin, but she never required Welin to help Kennedy. Ulm sent Kennedy demanding text messages while she circulated and at night when Kennedy was at home, but she did not send the white nurses demanding text messages. While working in ROC, Kennedy was not allowed to ask ROSE nurses to cover for her when she needed coverage, but when Kennedy was working at ROSE she was directed to cover for Welin at ROC. Welin quit her employment with Reid with only a five-day notice, and then Reid rehired her soon thereafter. On the other hand, Kennedy gave a full two-week resignation notice and was required to work the two-week period, and then she was listed as ineligible for rehire. Kennedy and Evans, a white nurse, had the same last day at ROC,

and even though Evans had work history problems, she was given a conditional rehire status. Kennedy was ineligible for rehire after complaining about discrimination and harassment.

Responding to ROSE's argument, Kennedy argues that she suffered adverse employment actions at ROSE because she did not receive training until she requested it, and she was told to submit her notice of resignation after she complained about Dr. Bhangoo eating her food. She also asserts that the actions at ROSE were a continuation of the adverse actions that she experienced at Reid in the ROC department. Although ROSE provided some training after Kennedy complained about a lack of training, it did not eliminate the adverse employment action. Kennedy did not receive the training for three months (from November 2013 to February 2014) during which time she was written up three times for her mistakes that were due to a lack of training. Kennedy points to a "1 – below expectations" rating that she received for ROSE "quality indicators." She asserts that ROSE did not correct the verbal criticism that she received or the three write-ups. Kennedy argues that the evidence supports a finding of constructive discharge based on the conduct that occurred at Reid, the verbal criticism at ROSE, Dr. Bhangoo eating her food, and then ROSE's request that she resign. After she followed ROSE's direction to submit a resignation after the Dr. Bhangoo food incident, ROSE stated that she was "not a good fit in surgery" and would not rehire her.

As evidence showing similarly situated employees at ROSE who are outside her protected class were treated more favorably, Kennedy points to the following: in March 2014, Dr. Miller came into the operating room and yelled at Kennedy for not telling Kirkland (a white nurse and Kennedy's trainer) that she was doing something wrong. He then said, "stupid bitches" under his breath. When Kennedy worked at ROC, she was not allowed to ask ROSE nurses to cover for her, but when Kennedy worked at ROSE, she was asked to cover for white ROC nurses. White

employees—Jaime Nickell and Shawn (last name unknown)—were given better training, and white nurses did not have to ask for training in order to receive it ([Filing No. 86-1 at 15](); [Filing No. 86-5 at 35]()).  ROSE did nothing to correct the white nurses who laughed at her after she was humiliated by Dr. Bhangoo eating her food.  Reid rehired a white nurse, Amanda Taylor, who resigned from her position with ROSE without a two week notice ([Filing No. 86-5 at 24]()).

Reid and ROSE reply that, in order to survive summary judgment, Kennedy must do more than simply assert a laundry list of negative experiences and that she was the only African-American nurse.  They point to *Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d 888, 900 (7th Cir. 2016) (plaintiff argued "only he had the 'laundry list' of negative experiences and that he was the only African-American foreman in the department, which he suggests should be enough to show that people outside his protected class 'received systematically better treatment.' . . . [B]ut the experiences [he] has identified do not 'point directly to a discriminatory reason for the employer's action' in demoting or suspending him. Simply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus.").

Concerning the allegation of a failure to train, ROSE replies that Kennedy did not identify any training that she should have received but did not, and she did not identify any training provided to similarly situated white nurses that she did not receive.  ROSE notes that Kennedy mentioned Jamie Nichols and Shawn (last name unknown) received better training, but Kennedy failed to identify any training that Jamie Nichols and Shawn received that she did not receive, and she did not provide any evidence that she was similarly situated with Jamie Nichols and Shawn. Jamie Nichols and Shawn may have had less experience than Kennedy and required different training.  ROSE asserts that Kennedy made no effort to demonstrate that Jamie Nichols and Shawn

were similarly situated to her, so her unsupported claim is insufficient to prove discriminatory training.

Regarding Kennedy's assertion that she received a "1 – below expectations" rating on ROSE's "quality indicators," ROSE argues this was only one of many categories of expectations, and in all the other categories, Kennedy was rated as meeting expectations, so her overall review indicated that Kennedy met expectations, so this was not an adverse employment action (Filing No. 86-23 at 8–9). In addition, Kennedy's evidence shows the doctors yelled and cursed at all the nurses, both Caucasian and African-American, and Dr. Bhangoo ate food belonging to any nurse regardless of their race.

While the Court considers whether Kennedy was subjected to an adverse employment action and whether similarly situated employees outside of her protected class were treated more favorably, the ultimate question the Court considers is "whether the evidence would permit a reasonable factfinder to conclude that [Kennedy's] race . . . caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. A dispute of material fact exists regarding adverse employment actions at Reid and whether Reid's similarly situated white employees were treated more favorably than Kennedy.

Pointing to Kennedy's deposition testimony and the ROSE job application, the Defendants argued that Kennedy sought a job transfer to ROSE because she did not like the hours she was scheduled at ROC and she voluntarily resigned as charge nurse because she could not handle the stress of the additional responsibilities. But as Kennedy explained, these facts only tell half the story and do not account for the numerous experiences and complaints of harassment and discrimination, which caused the stress Kennedy experienced and which affected her ability to perform at work.

The evidence, while disputed, supports the allegation that Kennedy was compelled to resign as the charge nurse, which caused her to lose supervisory authority and pay. The disputed evidence supports the allegation that Kennedy was subjected to a racially humiliating work environment, and that when she complained over a number of months, Reid did not address the problems. The evidence, while disputed, supports the allegation that Kennedy was pressured into resigning from her position at Reid, which arose from hostile experiences, some of which were based on race. These are sufficient adverse employment actions to get Kennedy over the summary judgment hurdle.

The Court notes that, when considering similarly situated employees, a "plaintiff must show that there is someone who is directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (citations omitted). However, a similarly situated employee "need not be identical in every conceivable way." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). The analysis calls for a "flexible, common-sense" approach. *Id.* The "similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone." *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010).

The designated evidence shows support for Kennedy's allegation that similarly situated employees at Reid who are outside her protected class were treated more favorably. This includes among other things: Padgett providing coverage for restroom and lunch breaks to Harrison (also a nurse) but not to Kennedy; Welin (also a nurse) being rehired by Reid after quitting with only a five-day notice but demanding that Kennedy work her full two-week resignation period and then later listing her as ineligible for rehire; and Evans (also a nurse) being given a conditional rehire status despite her work history problems while giving Kennedy an ineligible rehire status. These

examples found in the designated evidence allow Kennedy to move beyond the summary judgment stage.

Sufficient evidence has been designated that could allow a reasonable factfinder to conclude that Kennedy's race caused the adverse employment actions at Reid. Therefore, the Court **denies** Reid's Motion for Summary Judgment on Kennedy's race discrimination claim.

Regarding Kennedy's race discrimination claim against ROSE, the designated evidence fails to support Kennedy's allegations that she suffered an adverse employment action at ROSE and similarly situated white employees were treated more favorably than Kennedy. Kennedy has not designated sufficient evidence showing that she was denied training or that her training was delayed, and she has not designated any evidence that the conduct complained of was due to her race.

The vague assertions regarding Jaime Nichols and Shawn do not indicate what training they received or if they were in any way comparable to Kennedy. Kennedy points to no evidence showing what training was provided to unidentified white nurses that she did not receive. The designated evidence shows that Barley started providing training to Kennedy within about one month of Kennedy joining ROSE ([Filing No. 86-22](#)), after Kennedy's other assigned trainers were not providing adequate training. The evidence shows that ROSE provided training to Kennedy when she began work, increased the training when Kennedy complained that the initial training was insufficient, provided good performance reviews, and advanced her by adding her to the on-call list.

The designated evidence concerning the food incident with Dr. Bhangoo does not support an adverse employment action taken by ROSE against Kennedy. It was a juvenile prank that caused stress for Kennedy. The evidence indicates that the prank had nothing to do with

Kennedy's race as Dr. Bhangoo ate everyone's food. Although Kennedy points to evidence that she was invited to resign after complaining about the Dr. Bhangoo incident, it still is not related in any way to Kennedy's race, and thus, cannot support Kennedy's race discrimination claim.

Because the designated evidence does not support Kennedy's allegations that she suffered an adverse employment action at ROSE and similarly situated white employees were treated more favorably, the Court **grants** ROSE's Motion for Summary Judgment on Kennedy's race discrimination claim.

### 3. Retaliation

As noted above, to support a retaliation claim, Kennedy must show that: (1) she engaged in a statutorily protected activity; (2) she satisfactorily met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly situated employee who did not engage in the statutorily protected activity. *Harper*, 687 F.3d at 309.

Reid asserts that Kennedy cannot establish a *prima facie* case for her retaliation claim because Ulm's proposal that Kennedy be considered ineligible for rehire was a mere proposal and not an adverse employment action, and there is no evidence that Kennedy's complaints to Stewart about discrimination were the "but-for" cause for Ulm's proposal. Reid asserts that Ulm did not make her recommendation because of Kennedy's November 18, 2013 complaint to Stewart. Rather, Ulm based her recommendation on her perception that, in the last couple of weeks of Kennedy's employment with Reid, Kennedy was uncooperative, disengaged, and insubordinate.

ROSE asserts that Kennedy's retaliation claim against it is based on her alleged lack of training and allowing Dr. Bhangoo to eat her food. ROSE asserts that this is insufficient to support a retaliation claim because Kennedy has failed to show that her alleged retaliators knew about her

complaints at Reid, that she suffered any adverse employment action at ROSE, and that a similarly situated employee who did not engage in statutorily protected activities was treated better.

Kennedy argues that after she complained to Stewart in human resources about the discrimination and harassment, Stewart met with Ulm the next day, November 19, 2013. ([Filing No. 86-31](#).) Stewart told Ulm that, as the charge nurse, Ulm had to hold others accountable to Reid's standards. Then, on November 27, 2013, Ulm retaliated against Kennedy by writing on the Employment Action Sheet for Kennedy's resignation that Ulm would not rehire Kennedy because of her work performance and attitude toward the facility. This recommendation was directly contrary to Ulm's previous recommendation twenty days earlier that Kennedy was dependable, punctual, and efficient ([Filing No. 86-15 at 3](#); [Filing No. 86-18 at 1](#)). Kennedy also had just received a GEM award from a patient toward the end of November 2013 to recognize the service that Kennedy gave them, which was the first and only time a ROC employee received the award during the time that Kennedy worked there ([Filing No. 86-1 at 10](#)). Kennedy further explains that other nurses, like Evans, were treated better and given a conditional rehire status. Reid did not offer any evidence that Kennedy was uncooperative, disengaged, or insubordinate; all she did was complain about harassment and discrimination, which is a protected activity.

Regarding Ulm's statement that she be considered ineligible for rehire, Kennedy argues this was not a "mere proposal" because when Kennedy spoke with Nantz in human resources, Nantz told Kennedy that her file indicated she was ineligible for rehire. Reid then refused to consider Kennedy for rehire and told Kennedy that it would not rehire her. Therefore, Kennedy argues, she suffered an adverse employment action in retaliation for her complaint about discrimination and harassment.

Kennedy asserts that Reid and ROSE used the same human resources department, which handled all complaints of discrimination and some of the same doctors and nurses worked at both Reid and ROSE. Additionally, Kennedy told her ROSE supervisor, Miller, about the discrimination she experienced at Reid before joining ROSE. Thus, Kennedy asserts, there is evidence that the employees at ROSE knew about what happened at Reid. Kennedy also asserts that she complained to her supervisors about discriminatory training at ROSE. Miller told other employees that Kennedy was stupid, and then employees allowed Dr. Bhangoo to eat her food. After she complained about the food incident, ROSE invited her to resign.

The Court determines that Kennedy has presented sufficient evidence to move forward with her claim for retaliation against Reid. Ulm's recommendation that Kennedy not be eligible for rehire because of work performance and attitude appears to have affected her ability to obtain work with Reid and possibly with other potential employers. This recommendation came soon after Ulm had provided a positive employee review and positive reference to ROSE and soon after Stewart chastised Ulm about correcting discrimination and harassment about which Kennedy complained. The designated evidence shows a dispute of material fact concerning this issue. It also appears that Evans was provided better treatment than Kennedy despite their similarities. Therefore, this claim must be presented to the fact finder to determine this issue and Reid's Motion for Summary Judgment on the retaliation claim is **denied**.

For the reasons explained above, the Court finds that Kennedy's retaliation claim against ROSE must be dismissed on summary judgment. The evidence indicates that Kennedy did not suffer any adverse employment action (lack of training or allowing Dr. Bhangoo to eat her food) because of her complaints of discrimination and harassment. The Court further notes that Kennedy's complaining to ROSE about Dr. Bhangoo eating her food is not a statutorily protected

activity, and again, the food incident was not related to Kennedy's race. Therefore, the Court **grants** ROSE's Motion for Summary Judgment on Kennedy's retaliation claim.

Finally, the Court notes that Reid asserts Kennedy failed to mitigate her damages, and it should be granted summary judgment on her failure to mitigate damages. Kennedy designated evidence regarding her efforts to seek employment and mitigate her damages after leaving Reid. The Court will leave this disputed issue for trial.

### IV.    CONCLUSION

For the reasons stated, the Court **GRANTS in part and DENIES in part** Reid's Motion for Summary Judgment (Filing No. 55), and **GRANTS** ROSE's Motion for Summary Judgment (Filing No. 58). Summary judgment is entered in favor of ROSE on all claims asserted against it, and ROSE is **dismissed** as a defendant in this action. Summary judgment is entered in favor of Reid on Kennedy's ADA disability claims. Kennedy's claims against Reid for harassment, discrimination, and retaliation based on race **remain pending for trial** in this litigation.

**SO ORDERED.**

Date: 9/7/2017

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@cgglawfirm.com

Eileen P. H. Moore
ICE MILLER LLP
eileen.moore@icemiller.com

Tami A. Earnhart
ICE MILLER LLP
earnhart@icemiller.com